UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
ADRIANO GIANNETTI DEDINI OMETTO
and ADRIANO OMETTO AGRÍCOLA LTDA.,

                Petitioners,                Case No. 12-cv-01328-(JSR)

       v.

ASA BIOENERGY HOLDING A.G.,
ABENGOA BIOENERGIA AGRÍCOLA LTDA.,
ABENGOA BIOENERGIA SÃO JOÃO LTDA.,
ABENGOA BIOENERGIA SÃO LUIZ S.A., and
BIOENERGUA SANTA FÉ LTDA.,

                Respondents.
---------------------------------------------------------------x

**PETITIONERS' POST-HEARING MEMORANDUM IN SUPPORT OF
MOTION TO VACATE AND IN OPPOSITION TO MOTION TO CONFIRM**

**PRELIMINARY STATEMENT**

The evidence developed since the May 16 argument on these motions confirms Ometto's position throughout these proceedings. Rather than following the rules of the ICC and his own firm, Mr. Rivkin made his own rules to suit his own purposes and completely subverted the conflict checking and disclosure process. In the process, he short circuited necessary procedures. Mr. Rivkin intentionally excluded Abengoa, which he knew to be the real interested party in the Arbitrations, from Debevoise's conflicts checking database. He refused to run a conflict check for Arbitration 2 despite his obligations to the ICC and the parties to do so, while at the same time signing a statement indicating that he *had* run such a check. And he completely disregarded his continuing obligation to investigate and disclose conflicts of interest under the ICC Rules.

To make matters worse, Mr. Rivkin has not been candid with the ICC, the parties or this Court. His testimony removed all doubt that he knew or should have known of material conflicts of interest involving his firm and Abengoa that he never disclosed. Whether his failure to investigate and disclose these conflicts was intentional or simply reckless, it is strong evidence of his evident partiality and grounds for vacatur. His misleading and often contradictory testimony continued the pattern of obfuscation and lack of candor, further revealing his bias.

If this Court's review of arbitral awards means anything, it means that a situation in which an arbitrator fails to disclose major conflicts of interest and then distorts the truth when the conflicts are brought to his attention cannot stand. To find otherwise would compromise the procedural integrity of arbitration, incentivize arbitrators to be less than diligent, and deny parties the ability to learn facts necessary for an informed decision on arbitrator selection.

**ARGUMENT**

**I.      The Record Supports Vacatur Under Controlling Law.**

In this Circuit, an arbitral award governed by the FAA may be vacated based on the evident partiality of an arbitrator where it is shown that the arbitrator: (1) had actual knowledge of a material relationship requiring disclosure and failed to disclose it (*Applied Indus. Materials Corp v. Ovular Makine Ticaret Ve Sanyi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007)); or (2) willfully insulated himself from learning of such a relationship (*id.* at 138). Ometto Memorandum of Law, dated February 13, 2012 ("Ometto Opening Mem.") at 20-28; Ometto Reply Memorandum of Law, dated April 13, 2012 ("Ometto Reply Mem.") at 4-21. The record supports vacatur of the Awards on both grounds.

**A.      Mr. Rivkin Had Actual Knowledge Of The MBIA/Abengoa Matter.**

As a result of discovery taken since the May 16 hearing, an additional, previously undisclosed material conflict has come to light: the MBIA/Abengoa matter. As Mr. Rivkin testified, Debevoise represented MBIA in connection with its financing of an Abengoa toll road project in Brazil. July 12, 2012 Hearing Tr. ("Tr.") at 7; Petitioners' Exhibits for July 20, 2012 Hearing ("Pet. Binder"), at DEBE0000150. This representation was listed as "active" in the report of the May 20, 2009 conflict check Mr. Rivkin conducted before accepting his appointment in Arbitration 1 (the "May 20, 2009 Conflict Check"). Pet. Binder Ex. 1 at DEBE0000150. Mr. Rivkin thus knew of the matter *before* the Arbitrations began.

Mr. Rivkin was obligated to disclose the MBIA/Abengoa matter under the ICC Rules, which require disclosure of "facts or circumstances which might be of such a nature as to call into question the arbitrator's independence *in the eyes of the parties*." Schorr Decl. Ex. 57 (emphasis added). Had Mr. Rivkin disclosed this matter, Ometto would have challenged his confirmation as Chair at the outset of

the Arbitrations. At the very least, a current Debevoise client was adverse to Abengoa – meaning that Mr. Rivkin was required under the IBA Guidelines (which he helped write) to disclose this relationship to the parties. IBA Orange Guideline 3.4.1 requires disclosure where "[t]he arbitrator's law firm is currently acting adverse to one of the parties or an affiliate of one of the parties." *See* Ometto Opening Mem. at n. 65. Moreover, given its status as lender to Abengoa, MBIA appears to have had, and may still have, an economic interest in the financial health of its Abengoa counterparty and its affiliates – and derivatively, the Abengoa parties' success in the Arbitrations. Thus, regardless of when Debevoise last billed time to the matter,[1] Mr. Rivkin was required to disclose it. *Id.* at 24-26; Ometto Reply Mem. at 18-19.

Mr. Rivkin had multiple opportunities to disclose this material relationship, yet repeatedly chose to conceal it. He could (and should) have disclosed it in his statements of acceptance and independence in Arbitrations 1 and 2. Moreover, after Ometto expressly requested on December 21, 2011 that Mr. Rivkin disclose all potentially relevant matters involving his firm, he could (and should) have disclosed it in his letters to the ICC and the parties. *See* Pet. Binder Ex. 12 at 3 (asking Mr. Rivkin if there are "any other disclosures concerning the Chairman's law firm that should be made at this time?").

Mr. Rivkin's failure to disclose the MBIA/Abengoa matter, standing alone, warrants vacatur. *See Applied Industrial*, 492 F.3d at 137 ("An arbitrator who knows of a material relationship with a party and fails to disclose it meets *Morelite's* evident partiality standard."). And his consistent efforts throughout the challenge process to avoid revealing the existence of that matter to Ometto make the case for vacatur all the more compelling. *See* Section II.A & B, below.

  **B.** **Mr. Rivkin Willfully Blinded Himself To The DOE Matters.**

  1. <u>Mr. Rivkin's Failure To Run A Conflicts Check For Arbitration 2</u>: Mr. Rivkin had an obligation to perform a new conflicts check prior to accepting his appointment in Arbitration 2. The obligation arose under the ICC Rules, FAA case law, the ethical rules governing his conduct as a member of the New York bar, and simply by virtue of his signing his statement of acceptance and independence for Arbitration 2. *See* Ometto Opening Mem. at 26-28; Ometto Reply Mem. at 13-15. In that statement, Mr. Rivkin affirmatively represented to the ICC and to the parties that he was aware of no potential conflict of interest requiring disclosure, and that in reaching that conclusion, he had "***take[n] into account*** . . . whether there exist[ed] any past ***or present*** relationship direct or indirect, between [himself] and any of the parties, their related entities or their lawyers or other representatives, whether financial, professional or of any other kind." Pet. Binder Ex. 6 (emphasis added).

Yet as Mr. Rivkin conceded, he chose not to run such a check:

> Q. [MR. HRANITZKY]  In fact, you never ran the conflicts check in the period just before you accepted your appointment as chair in the second arbitration, did you?
>
> A. [MR. RIVKIN]  That's right…as a formal matter it was a second arbitration, but I viewed it as simply being a continuation of the first matter.

Tr. at 25.

---

[1]   There is no evidence that Mr. Rivkin knew when Debevoise last billed time on the MBIA/Abengoa matter when he signed his June 14, 2009 statement of acceptance and independence in Arbitration 1.

2

Mr. Rivkin's excuse that he was not required to run a separate conflict check for Arbitration 2 because it was merely a continuation of Arbitration 1 is not credible. After extensive briefing, the ICC rejected Ometto's request for consolidation of the Arbitrations (which Abengoa opposed) in April 2010. Schorr Decl. Ex. 3 ¶¶26-28. The ICC's message was clear – the Arbitrations were to be treated separately. This is why Mr. Rivkin was required to submit a separate statement of acceptance and independence for Arbitration 2. And as Mr. Rivkin knows, Arbitration 2 followed a separate arbitrator nomination and confirmation procedure from Arbitration 1. Schorr Decl. Ex. 3 ¶29. It was therefore not automatic that the same Tribunal would preside over Arbitration 2.

Finally, regardless of whether Mr. Rivkin considered the Arbitrations as separate or as a continuation of each other, he had a continuing duty under the ICC Rules to investigate and disclose any potential conflicts. Specifically, the ICC Rules require an arbitrator to "immediately disclose...any facts or circumstances…which may arise during the arbitration" that "call into question the arbitrator's independence in the eyes of the parties." Schorr Decl Ex. 57 at Articles 7(2)-(3).

2.  Mr. Rivkin's Failure To Enter The Parents' Names Into the Conflicts System: Mr. Rivkin's refusal to include ASA's parent "Abengoa" into Debevoise's conflict checking database (against which future conflict checks would be run) was contrary to Debevoise policy, basic conflict checking standards, and Mr. Rivkin's own logic. The May 20, 2009 Conflict Check identified "Abengoa" as ASA's ultimate parent. Pet. Binder Ex. 1 at DEBE0000007. It also instructed Mr. Rivkin to list the parent company names identified in the conflict check in the Item 25 "Conflicts Cross References" field of the accompanying New Client/Matter Memorandum. *Id.* The instructions for Item 25 of the Debevoise form "New Matter Memo" reiterated the instruction to "[l]ist…affiliates of the client and other persons known to be involved in the matter…."[2] *Id.* at DEB0000003. Mr. Rivkin conceded that he ignored these instructions and refused to enter "Abengoa" into Debevoise's conflicts database because "it had not been [his] practice to do so." Tr. at 13. Including parents in a firm's conflict checking system is a basic requirement for competent conflict checking. *See* Ometto Opening Mem. at n. 67. Moreover, Mr. Rivkin admitted to the possibility of relationships between Debevoise and Abengoa that could disqualify him as arbitrator, such as a direct Debevoise representation of Abengoa. Tr. at 12. Yet he refused to take action that would warn him and other Debevoise partners of such a relationship arising. In doing so, Mr. Rivkin violated his continuing duty to the parties under the ICC Rules to investigate and disclose potential conflicts.

Further, the record shows that Mr. Rivkin failed to enter the four counterclaim respondents with "Abengoa" in their names (the "Abengoa Entities") into Debevoise's conflicts database when they were added as parties to Arbitration 1. Mr. Rivkin claims he requested an unidentified assistant or associate to add the Abengoa Entities to Debevoise's conflicts checking database when they were added to Arbitration 1. Tr. at 10. But even if Mr. Rivkin made this request, he certainly failed in his duty to supervise the process, because it was not carried out. Pet. Binder Ex. 6 at DEBE0000006.

Mr. Rivkin's assertion that he felt secure in his conflicts checking procedures because he thought he had added the Abengoa Entities into the conflicts database does not withstand scrutiny. First, Mr. Rivkin had no idea at the time he submitted the New Client/Matter Memorandum for Arbitration 1 on

---

[2] Mr. Rivkin's testimony that Item 25 only required him to include "affiliates that were involved in the matter in some way," thereby relieving him of his obligation to list Abengoa, misses the mark. It was clear to Mr. Rivkin throughout the Arbitrations that ASA's parent was deeply involved in the Arbitrations. In its Request for Arbitration in Arbitration 1, Abengoa stated that ASA was a subsidiary of Abengoa S.A., and that notices were to be sent to counsel for Abengoa S.A. and Abengoa Bioenergía Brasil S.A. Schorr Decl. Ex. 19 ¶¶4-5.

3

June 24, 2009 without including "Abengoa" in the "Conflicts Cross References," that the Abengoa Entities would be added later.  Ometto first requested that the Abengoa Entities be added on August 21, 2009, and the parties and the Tribunal only agreed to add the Abengoa Entities at a preliminary meeting on October 16, 2009.  Schorr Decl. Ex. 2 ¶¶ 25-27.  Second, as Mr. Rivkin admitted, if a conflict involving Abengoa arose in the nearly half year interim period between Mr. Rivkin's May 20, 2009 conflict check and the time the Abengoa Entities were added to Arbitration 1 in October 2009, he would not have been made aware of it because the word "Abengoa" was not in the Debevoise conflicts database.  Tr. at 26-27.  In fact, the Solana matter (referred to in the Debevoise conflicts system as "DOE-Abengoa Solar") was entered into the Debevoise system on August 7, 2009.  Pet. Binder Ex. 13 at DEBE0000158.  Thus, even if Mr. Rivkin's instructions had been executed exactly as he alleges he gave them, he still would not have discovered this major representation involving Abengoa.

       Even when reading Mr. Rivkin's testimony in the most favorable light, his conflict checking procedures are shown to be patently deficient.  Whether this deficiency was intentional or simply reckless, it evidences Mr. Rivkin's evident partiality.  *See Schmitz v. Zilveti*, 20 F.3d 1043, 1049 (9th Cir. 1994) (explaining that arbitrator's failure to conduct competent conflict checking "is not an excuse" for the arbitrator's failure to disclose material relationships).

       3.     <u>Mr. Rivkin Would Have Learned Of The DOE Matters If He Had Complied With His Obligations</u>:  Mr. Rivkin would have learned of the Solana and Mojave matters immediately after they were opened if he had entered "Abengoa" into the Debevoise conflicts system as ASA's parent – as he was required to do when he opened a new matter for Arbitration 1 on June 24, 2009.  Pet Hearing Binder Ex. 4 at DEBE0000001 and Ex. 13 at DEBE0000158.  It is equally clear that if Mr. Rivkin had run a new conflicts check before accepting his appointment in Arbitration 2 on May 20, 2010, as he was also required to do, the conflicts check would have picked up these matters.  *See* Pet. Binder Ex. 13 at DEBE0000158 (Solana matter opened on August 7, 2009 and Mojave matter opened on May 10, 2010).  It is also beyond dispute that the Solana and Mojave matters created a material relationship between Debevoise and entities related to the Abengoa parties which Mr. Rivkin was obligated to disclose.  *See* Ometto Opening Mem. at 24-26; Ometto Reply Mem. at 16-19.  As the record now shows, Abengoa Solar (which is sufficiently related to the Abengoa parties to the Arbitrations that its CEO served as those parties' key witness!) has a ***direct*** contractual obligation to pay Debevoise's legal fees in connection with both projects.  Tr. at 30; Pet Hearing Binder, Exs. 5 and 8.  Indeed, Abengoa Solar paid Debevoise approximately ***$6.5 million*** during the course of the Arbitrations.  Tr. at 35.  Consequently, Debevoise had ***at least*** an indirect interest in the Abengoa parties' success in the Arbitrations – because the outcome could have affected Abengoa Solar's ability to meet its contractual obligations to Debevoise. Ometto initially asserted counterclaims that were substantial in size and scope, and as such it appeared that Abengoa could be affected financially as a result of an Award against it.  Debevoise's client, the DOE, had a similar interest in the Abengoa parties' success in the Arbitrations insofar as an unfavorable outcome could have increased the likelihood that Abengoa Solar would default – thereby triggering the DOE's guarantee obligations.  The fact that Debevoise may not have had an expectation of future business with any Abengoa party when Mr. Rivkin accepted his appointments, even if true, is irrelevant.  What matters for independence purposes is not whether the arbitrator's firm expects to do business with a party in the future, as Mr. Rivkin self-servingly testified.  Tr. at 31.  If, as is the case here, the arbitrator's firm could be affected financially by the success or failure of one of the parties in the arbitration, then the arbitrator is not independent and that matter must be disclosed. In addition, in *Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire and Marine Ins. Co.*, the Second Circuit ruled that an "ongoing business arrangement with a party" must be disclosed.  668 F.3d 60, 74 (2d Cir. 2012).

4.  <u>Mr. Rivkin's Actions Amount To Willful Blindness And Require Vacatur</u>: By deliberately choosing not to comply with his obligations, Mr. Rivkin willfully blinded himself to learning of material relationships that required disclosure. By all appearances, after receiving the May 20, 2009 Conflict Check and determining (incorrectly) "that there was no problem," he sought to shut himself off from information that could point to the existence of a problem during the Arbitrations. Tr. at 9. But an arbitrator may not unilaterally decide to shield himself from information about potential conflicts. *Applied Industrial,* 492 F.3d at 138. Moreover, Mr. Rivkin's explanation of why he felt he did not need to perform a second conflicts check, *i.e.*, that he viewed the two disputes as being part of the same arbitration, cannot stand. Mr. Rivkin affirmatively represented that he was free from any "past or present" relationship that might give rise to a conflict in his statement of acceptance and independence specific to Arbitration 2. *Compare* Tr. at 25-27 *with* Pet. Binder Ex. 6. Having failed to conduct a second conflicts check, Mr. Rivkin had no basis for making this false representation. And as noted in Section I.B.1, Mr. Rivkin had a continuing duty under the ICC Rules to investigate and disclose conflicts throughout the Arbitrations.

Mr. Rivkin's failure to conduct The necessary second conflicts check before certifying his independence was part of a larger and disturbing pattern of willful blindness. For example, Mr. Rivkin has now conceded that he received a "Daily Report of New Matters" which would have included both the Solana and Mojave matters. Tr. at 40-42. And before submitting the Awards to the ICC, Mr. Rivkin received another internal email describing those representations in detail. Tr. at 42; Pet. Binder Ex. 10. Mr. Rivkin only had to glance at any of these emails to become aware of a major conflict involving his firm and Abengoa, yet supposedly never looked at any of them.

Petitioners can only speculate as to why Mr. Rivkin was so eager to quarantine himself from knowledge of conflicts. It is likely that he was determined to chair both Arbitrations. It also appears that Mr. Rivkin's practice was designed to limit the conflicts footprint his service as an arbitrator creates for his firm by failing to include key parents and related entities in the conflicts database – despite the fact that doing so violated Debevoise policy. But the law does not require Petitioners to divine Mr. Rivkin's reasoning. Where, as here, an arbitrator willfully blinds himself or herself to the existence of a potential conflict of interest, that conduct is indicative of bias in and of itself. *See Applied Industrial*, 492 F.3d at 138 ("when an arbitrator knows of a potential conflict, a failure to either investigate or disclose an intention not to investigate is indicative of evident partiality.").

## II.  Mr. Rivkin's Claim That He Was Independent And Unbiased Is Not Credible In Light Of His Conduct And Testimony.

While Mr. Rivkin's failures to investigate and disclose material conflicts of interest described in Section I are in and of themselves sufficient to warrant vacatur of the Awards, Mr. Rivkin's lack of candor and pattern of obfuscation after Petitioners brought these matters to his attention further evidences his evident partiality. *See Applied Industrial*, 492 F. 3d at 138 ("[I]f an arbitrator fails to investigate facts that come to light after the award . . . the aggrieved party may use this information to demonstrate evident partiality") (quoting *ANR Coal Co. v. Cogentric of N.C.*, 173 F.3d 493, 500 n 4 (4th Cir. 1999)). And while Petitioners are not required to prove that Mr. Rivkin was actually biased, *see Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984), Mr. Rivkin's repeated, self-serving statements that he was independent cannot be credited in light of the evidence and his conduct. *See Applied Industrial*, 492 F.3d at 139 ("An arbitrator's subjective good faith is not the test."). Mr. Rivkin's inconsistent statements and attempts to obscure key facts are evidence of his lack of credibility as a witness, as well as his evident partiality.

### A. Mr. Rivkin's Statements of Independence And Letters To The ICC Were Misleading.

From the very onset of Arbitration 1, Mr. Rivkin made misleading statements to the ICC and to the parties – first to preserve his ability to act as Chair, and later to defend his actions and his reputation. As discussed above, the pattern began with his statement of acceptance for Arbitration 1 in which he misleadingly represented that he was aware of no matters requiring disclosure, despite knowing of the MBIA/Abengoa matter. It continued with his statement of acceptance and independence for Arbitration 2 – in which he misleadingly implied that he had run a conflicts check for that Arbitration, when he had deliberately chosen not to. Pet. Binder Ex. 6.) As noted, Mr. Rivkin tried to explain away this omission by arguing that he believed the names of all the Abengoa Entities were added to the list of "Conflicts Cross References" for Arbitration 1 almost a half year later. Tr. at 25-26; *see also* Section I.B. But he later acknowledged under examination by the Court that this indirect stop-gap measure – which was never even implemented – would have failed to identify the conflict that was created when Mr. Mattei took on the Solana matter in August 2009. Tr. at 27; *see also* Section I.B.2.

Mr. Rivkin's efforts to hide inconvenient facts and to squelch further inquiry stepped up considerably after Petitioners challenged his independence on December 27, 2011. Indeed, his first communication to Petitioners (and his first communication to the ICC of which Petitioners are aware), a letter dated January 8, 2012, was misleading in at least two important ways. ***First***, it does not mention that Mr. Rivkin did not perform a conflict check before accepting his appointment in Arbitration 2. *See* Pet. Binder Ex. 18. ***Second***, the letter appears to have been carefully drafted to leave the reader with the impression that the word "Abengoa" was not run through the system when Mr. Rivkin ordered the first conflicts check – when in fact, that word *was* searched and generated a hit for the MBIA/Abengoa matter. Pet. Binder Ex. 1 at DEBE0000150. The second paragraph of that letter begins:

> Due to an administrative error, only the names of the original parties to [Arbitration 1] – ASA Bioenergy Holding AG and Mr. Adrianno Giannetti Dedini Ometto – were entered into our firm's conflict system.

Pet. Binder Ex. 18, at 1. A reader informed of all of the surrounding facts would understand that what Mr. Rivkin actually meant by these words is that – as the following sentence obliquely communicates – the word "Abengoa" was never entered into the "Conflicts Cross References" field of the New Matter Memo for Arbitration 1. Pet. Binder Ex. 4 at 3. However, an uninformed third party like Ometto could not possibly have understood that this was Mr. Rivkin's intended meaning.

While one might ordinarily dismiss this as an unintended consequence of inartful drafting, it is much harder to excuse when considered together with the fact that Mr. Rivkin failed to mention the MBIA/Abengoa matter in his January 8 letter – or indeed, in ***any*** of his communications with the parties or the ICC. *See* Section I.A above. In fact, it appears that Mr. Rivkin drafted his January 8 letter to avoid inviting questions about what the conflicts check he performed on May 20, 2009 revealed – as such questions would force him to acknowledge that he knew about, and failed to disclose, the MBIA/Abengoa matter before he accepted his appointment in Arbitration 1.

Mr. Rivkin's January 26 email (in which he resigned as Chair) was also misleading because it implied that the facts and circumstances leading to his decision to resign had changed materially between January 8 and January 26. In fact, they had not. Specifically, Mr. Rivkin cites two facts explaining his about-face between January 8 (when he refused to resign) and January 26: ***First***, that it had just been brought to his attention that First Reserve owns a 15.9% interest in Abengoa; and ***second***, that he had just learned that Ometto did not believe he should continue on as Chair. Pet. Binder Ex. 24

6

at 2. Yet Mr. Rivkin knew both of these facts on January 8. Indeed, he admitted that he knew about First Reserve's interest in Abengoa as of January 8. Tr. at 45. And while he testified that it was not yet clear to him on January 8 that the Petitioners lacked confidence in his ability to act independently as Chair (*id.*), this testimony is simply not credible given that Petitioners **formally challenged** his ability to do so twelve days earlier. Pet. Binder Ex. 15, pp. 1-2.

### B. Mr. Rivkin's Testimony At The July 20 Hearing Is Riddled With Inconsistencies And Implausible Contentions.

Mr. Rivkin's disturbing pattern of making misleading statements to defend his actions and reputation or to conceal embarrassing information continued in his testimony. For example, in an effort to defend his insistence on staying on as Chair until the last possible moment, Mr. Rivkin testified that Mr. Albanesi – the ICC attorney responsible for administering Ometto's challenge to independence – was opposed to his resignation. *See* Tr. at 16 ("the ICC didn't think [my resignation] was necessary"). Given Mr. Albanesi's position as counsel to the judicial body charged with adjudicating the challenge application, it is highly implausible that he would have communicated *any* view on the merits of that application to Mr. Rivkin while it was pending.[3]

In other instances, this impulse to protect himself led Mr. Rivkin to contradict himself. For example, when asked why he did not run a conflicts check before accepting his appointment in Arbitration 2, he testified that he viewed that arbitration "as simply being a continuation of the first matter." Tr. at 25. When later asked by Ometto's counsel why, if he viewed the Arbitrations as being contiguous, he opened a new matter for Arbitration 2 anyway, he explained that the ICC "asks arbitrators for the amount of time they spend on each arbitration, and, therefore, I thought I had to record my time separately with respect to each one just in case it made a difference." *Id.* at 28. In fact, the ICC does not require arbitrators to record the time they spend on arbitrations *at all*. To the contrary, as Mr. Rivkin later conceded, the ICC compensates arbitrators based on the amount at stake in the matter – not the number of hours they spend working on it. Eric A. Schwartz, "The ICC Arbitral Process – Part IV: The Costs of ICC Arbitration," *ICC Bull.*, 1993, p. 8; *see also* Tr. at 53 ("of course, [under] the ICC system, we didn't get paid for [our recorded] time. We got paid on the basis of the size of the case.").

Mr. Rivkin was particularly cagey when discussing the MBIA/Abengoa matter and his relationship with the lead partner for this matter, Mr. Mattei. When asked by the Court if he conducted further inquiry into the matter when it appeared on his May 20, 2009 Conflict Check, Mr. Rivkin testified "I probably did but I just don't remember." Tr. at 7. But later, he testified "I ran this conflict check and I saw that there was no problem…" – implying that he did no more than look at the conflict report and unilaterally determine that he did not need to disclose the matter. Tr. at 9. To investigate the matter properly, Mr. Rivkin would have had to contact Mr. Mattei to obtain more information. Pet. Binder DEBE0000150. But Mr. Rivkin testified that he did not have any discussion with Mr. Mattei regarding the Arbitrations prior to January 2012. Tr. at 55.

Nonetheless, Mr. Mattei almost certainly knew of Mr. Rivkin's role in the Arbitrations, proving false (or at least highly misleading) Mr. Rivkin's assertion in his January 8 letter that "the partners involved in the [Solana and Mojave matters] did not know of my arbitration." Pet. Binder Ex. 18. In fact, ***Mr. Mattei relied upon Mr. Rivkin's May 20, 2009 Conflict Check when preparing the New Client/Matter Memoranda for both the Solana and the Mojave matters.*** Debevoise's August 2, 2012

---

[3]   Ometto provided the hearing transcript to Mr. Albanesi and invited him to comment on whether such conversations took place. *See* August 9, 2012 letter from counsel for Petitioners to C. Albenesi, attached as Appendix A.

7

Submission to the Court at DEBE0000926 (Solana), DEBE0000930 (Mojave).[4]  In the August 6, 2009 email chain in which Mr. Mattei instructed his assistant to prepare the New Client/Matter Memorandum for the Solana matter, his assistant reported the following to Mr. Mattei (after apparently being unable to locate a conflicts check Mr. Mattei told her that he had run for Abengoa):

> Records Services advises that *Rivkin* requested a conflicts check for Abengoa for May 20, 2009 (1156-09). Shall I use this number and say Rivkin reviewed or you?

Debevoise's August 7, 2012 Submission to the Court at DEBE0000981 (emphasis added).  Mr. Mattei responded "Me."  *Id.*  Mr. Mattei expressed no surprise that his assistant had discovered a conflict check for Abengoa that Mr. Rivkin had requested, and directed that he should be listed as the partner who reviewed this May 20, 2009 Conflict Check.  Unless Mr. Mattei was not being forthright, the logical inference from this exchange is that he was in fact aware at the time that Mr. Rivkin had run a conflict check on Abengoa, and that he in fact had reviewed it.  Thus, Mr. Mattei knew of Mr. Rivkin's role in Arbitration 1 – or at the very least that Mr. Rivkin was involved in a matter involving Abengoa.

Upon receiving notice that Mr. Rivkin had run a conflicts report on Abengoa, Mr. Mattei should have contacted Mr. Rivkin.  At least in Mr. Rivkin's view, the DOE representations put Debevoise "on the opposite side of the table from Abengoa."  Pet. Binder Ex. 18.  Thus, Mr. Mattei would have needed to contact Mr. Rivkin to find out why he ran a conflict check for Abengoa to determine if the Solana matter created any conflicts.  For Mr. Mattei not to do so, and instead to rely blindly upon Mr. Rivkin's conflict check (which by its very existence raised the possibility of a conflict for the Solana matter) without conducting any investigation would have been extremely negligent. Given the contemporaneous evidentiary record, it strains credibility to believe that Mr. Rivkin and Mr. Mattei never discussed Mr. Rivkin's role in the Arbitrations or the Solana and Mojave matters.

### C.    Mr. Rivkin's Lack Of Contrition And Aggressive Defense Of His Actions Suggest That He Has Something To Hide.

At least as troubling as the inconsistencies and implausible assertions in Mr. Rivkin's testimony are his aggressive defense of his conduct and lack of contrition.  The clearest example of this was his unqualified testimony, given without hesitation, that he would have been "absolutely" comfortable serving as arbitrator even if he had known when he accepted his appointment that an affiliate of one of the parties was paying his firm's legal fees in connection with other matters.  Under the IBA Guidelines that Mr. Rivkin himself helped write, the so-called "Waivable Red" category includes any significant commercial relationship between the arbitrator's firm and an affiliate of a party – meaning that such a relationship needs to be disclosed and affirmatively waived by the parties for the arbitrator to serve.  As explained in Section I.B.3 above, there is no legitimate dispute that the Solana and Mojave matters created such a relationship between Abengoa Solar and Debevoise.  Yet Mr. Rivkin refused to concede that this was even arguably so.  Instead, to justify his assertions to the ICC and to this Court that the Solana and Mojave matters did not require disclosure, he invented a definition of "financial" relationship that borders on the nonsensical.  According to Mr. Rivkin's testimony, "[i]f you view it in disclosure and independence terms," a relationship is not "financial" unless the arbitrator's firm has the prospect of receiving future business from the party or affiliate in question.  Tr. at 31.  Yet as Mr. Rivkin

---

[4]   Mr. Rivkin's knee-jerk response at the hearing that Mr. Mattei generated a conflict check when he took on the Solana matter was untrue.  Tr. at 8.  Mr. Mattei never conducted a conflict check for Solana.  Cover Letter to Debevoise's August 7, 2012 Submission to the Court.

is fully aware, where, as here, the arbitrator's firm could be affected financially by the success or failure of one of the parties in the arbitration, the arbitrator is not independent and the matter must be disclosed. *See also Scandinavian Reinsurance*, 668 F.3d at 74 (an "ongoing business arrangement with a party" must be disclosed).

Similarly, Mr. Rivkin's aggressive defense of his failure to order that the names of the parties' parents be entered into the conflicts system revealed a willingness to say practically anything to justify his actions. He testified that it was not his practice – nor did he believe it was "generally the practice" – among Debevoise partners – to put parents' names into the conflicts system. Tr. at 11. Later, when shown language in the firm's standard conflicts check report that arguably requires the names of all affiliates to be listed in the "Conflicts Cross References" field of the new matter form, Mr. Rivkin relied on the grammatical ambiguity of the form to insist that Debevoise's policy did not require entry of parents' names into that field. Tr. at 19-20. Mr. Rivkin's stridency disappeared only after he was shown a different Debevoise form which unambiguously states that parent company names should generally be included in the Conflicts Cross References section of the New Client/Matter Memorandum (Item 25)." Pet. Binder Ex. 1, at DEBE0000007; Tr. at 23.

### III. The Policy Implications Of This Case Overwhelmingly Support Vacatur.

At the oral argument held on May 16, the Court described the message that upholding the Awards on the existing record would convey better than Ometto ever could.

> [THE COURT] The great thing about arbitration is that the arbitrators don't have to give any reasons for their decision, their decision is not subject to appeal, they can take as long as they want to handle a case, they can charge as much as they want.
>
> [MR. WEISBURG] It's paradise, Your Honor.
>
> [THE COURT] What you are telling me now is they can operate with patently deficient conflicts checks and it doesn't matter. And this is supposed to be a reasonable alternative to the rule of law?

Transcript of May 16, 2012 hearing at 13:19-14:3.

In fact, it *does* matter. The integrity of arbitration depends fundamentally on the parties understanding all facts material to their decision to entrust to the arbitrators near total – and essentially unreviewable – power to decide the case presented to them. *See Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 149 (1968) (highlighting the need to be "scrupulous to safeguard the impartiality of arbitrators" because they have "free rein to decide the law as well as the facts and are not subject to appellate review").

An affirmance of the Awards at issue here would send a message to arbitrators and parties worldwide that:

- An arbitrator need not run *any* conflicts check before accepting an arbitral appointment;

- An arbitrator is free to mislead the parties into believing that he or she did;

- An arbitrator may willfully to blind himself or herself to learning of any potential conflict;

- An arbitrator may do all of the foregoing in violation of the rules governing the arbitration, the ethical rules governing his or her conduct as an attorney, and the policies of his or her law firm;

- An arbitrator may then take steps to prevent his or her actions from coming to light – including concealing material facts, and making misleading statements to the parties, arbitral institutions and the courts;

and yet the FAA will provide no recourse to the parties for the arbitrator's actions.

That is neither "paradise," nor the law in this Circuit. To the contrary: "[a]rbitrators must take steps to ensure that the parties are not misled into believing that no nontrivial conflict exists." *Applied Industrial*, 492 F.3d at 138. When they fail to do so – and further, blind themselves to learning of disclosable conflicts – those facts in and of themselves are sufficient to "give pause" to "a reasonable observer attempting to assess whether evident partiality existed," warranting vacatur. *Id*. at 139. The evidence developed since the May 16 oral argument only reinforces that the facts of this case would give any reasonable observer far greater pause that those present in *Applied Industrial*, because the arbitrator in that case did not attempt to **conceal** his actions from the parties after questions were raised about his company's undisclosed relationships. Nor is there any indication in the *Applied Industrial* decision that the arbitrator knowingly **misled** the parties to defend his actions.

In short, any reasonable person with knowledge of the facts now in the record "would have to conclude that [he] was partial to one party in the arbitration." *Morelite Construction Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 76, 84 (2d Cir. 1984). The Awards should therefore be vacated.

## CONCLUSION

For the reasons set forth here and in Ometto's prior submissions, and based on the record before the Court on Ometto's motion to vacate the Awards, the court should grant that motion and deny Abengoa's motion to confirm the Awards.

Dated: New York, New York
       August 13, 2012

DECHERT LLP

By:  /s/ Dennis H. Hranitzky
     Dennis H. Hranitzky
     1095 Avenue of the Americas
     New York, New York 10036
     Tel. 212-698-3500
     Fax 212-698-3599
     dennis.hranitzky@dechert.com

*Attorneys for Petitioners*

HOGAN LOVELLS LLP

By:  /s/ Edward T. Schorr
     Edward T. Schorr
     Andrew M. Behrman
     Adam R. Feeney
     875 Third Avenue
     New York, New York 10022
     Tel. 212-918-3000
     Fax 212-918-3100
     Edward.schorr@hoganlovells.com

*Attorneys for Petitioners*